EXPRESS LIEN, INC.                                       CIVIL ACTION

VERSUS                                                    NO. 19-10156

HANDLE, INC., JEFFREY                          SECTION "R" (5)
NADOLNY, AND ABC INSURANCE
CO.


## ORDER AND REASONS


Before the Court is defendants' motion to dismiss for lack of personal jurisdiction[1] and motion to dismiss for failure to state a claim.[2]  Because defendants consented to jurisdiction in the Eastern District of Louisiana, the Court denies defendants' motion to dismiss for lack of personal jurisdiction. And for the reasons set forth below, the Court denies defendants' motion to dismiss for failure to state a claim with respect to plaintiff's breach of contract, Louisiana Unfair Trade Practices and Consumer Protection Law, and copyright claims.  The Court grants defendants' motion to dismiss for failure to state a claim with respect to plaintiff's fraud and trade dress claims.

---

[1]     R. Doc. 19.
[2]     R. Doc. 20.

Plaintiff is granted leave to file an amended complaint within twenty-one days of this Order.

## I. BACKGROUND

This case arises from a business dispute between two technology companies that provide services to the construction industry. The complaint contains the following factual allegations. Plaintiff Express Lien, which does business as Levelset, is a Delaware corporation with its principal place of business in New Orleans, Louisiana.[3] Put simply, Express Lien has developed software that allows parties involved in construction, such as contractors and subcontractors, to monitor and enforce their security rights with respect to construction projects.[4] Express Lien also assists in filing liens and notices when necessary.[5]

Express Lien's business is done largely through the company's website, which can be found at the URLs "levelset.com" and "zlien.com."[6] Express Lien's website contains a variety of content, including but not limited to document templates, answers to frequently asked questions, and blog

---

[3]     R. Doc. 1 at 2 ¶ 2.
[4]     *Id.* at 3-4 ¶ 9.
[5]     *Id.*
[6]     *Id.* at 3-5 ¶¶ 9-14.

articles.[7]  Express Lien has marked each page of the website with a copyright notice.[8]

To access the vast majority of the features of Express Lien's website, including the document templates for liens and notices, a customer must create an online account.[9]  And to create an account, a user must agree to the website's Terms of Use.[10]  These terms provide limitations on the use of the website, and specifically forbid "reverse engineering" and "impersonat[ing] any person or entity."[11]  The website also contains a forum selection clause, stating that any suit related to an alleged violation of intellectual property may be filed in any Louisiana state court or in the Eastern District of Louisiana.[12]

Defendant Handle, Inc., is a similar technology company that is headquartered in San Francisco, California.[13]  Handle performs substantially the same services as Express Lien.[14]  Express Lien alleges that Handle learned of Express's Lien's business on October 17, 2018, through a potential

---

[7]     *Id.* at 4 ¶ 12.
[8]     *Id.* at 5 ¶ 15.
[9]     *Id.* at 8 ¶¶ 31-32.
[10]    *Id.*
[11]    R. Doc. 1 at 9 ¶¶ 37-38.
[12]    R. Doc. 22-1 at 2.
[13]    R. Doc. 1 at 2 ¶ 3.
[14]    *Id.* at 6-7 ¶¶27-28.

3

buyer of Handle's business. Express Lien also alleges that Jeff Nadolny, an employee of Handle, visited Express Lien's website and created accounts under the name of fictitious companies. In doing so, Nadolny expressly agreed to the website's Terms of Use, including the forum selection clause. Express Lien alleges that Nadolny then plagiarized and reverse engineered Express Lien's content, in violation of the Terms of Use and Express Lien's copyrights, and used this content to develop Handle's website.[15] Express Lien also alleges that in developing Handle's website, defendants copied Express Lien's stylistic choices, including the design, layout, wording, color scheme, and font choices of Express Lien's site, in violation of Express Lien's trade dress.[16] Express Lien alleges upon information and belief that Nadolny's actions were taken at the direction of, and for the benefit of, Handle.[17]

Express Lien now brings five claims against Handle and Nadolny. These claims include: (1) breach of contract; (2) violation of the Louisiana Unfair Trade Practices and Consumer Protection Law; (3) fraud; (4) copyright infringement; and (5) trade dress infringement.[18] Defendants

---

[15] *See id.* at 8 ¶¶ 33-35, 21-23 ¶¶ 81-94.
[16] *See id.* at 24-26 ¶¶ 95-102.
[17] R. Doc. 1 at 14 ¶ 55.
[18] *See* R. Doc. 1 at 8-27.

Handle and Nadolny moved to dismiss for lack of personal jurisdiction, or, in the alternative, failure to state a claim for each cause of action.[19]

## II.    PERSONAL JURISDICTION

### A.    Legal Standard

Personal jurisdiction is "an essential element of the jurisdiction of a district court, without which the court is powerless to proceed to an adjudication." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 584 (1999) (internal quotation marks and citation omitted).   A district court may exercise personal jurisdiction over a defendant if "(1) the long-arm statute of the forum state creates personal jurisdiction over the defendant; and (2) the exercise of personal jurisdiction is consistent with the due process guarantees of the United States Constitution." *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002).   Because Louisiana's long-arm statute, La. R.S. § 13:3201, extends jurisdiction to the limits of due process, the Court need only consider whether the exercise of jurisdiction in this case satisfies federal due process requirements.  *Dickson Mar. Inc. v. Panalpina, Inc.*, 179 F.3d 331, 336 (5th Cir. 1999).

---

[19]    R. Doc. 19; R. Doc. 20.

When the district court rules on a motion to dismiss for lack of personal jurisdiction without an evidentiary hearing, the "uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor." *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008). But the district court is not required "to credit conclusory allegations, even if uncontroverted." *Panda Brandywine Corp.*, 253 F.3d 865, 869 (5th Cir. 2001).

## B.    Discussion

Express Lien argues that personal jurisdiction is proper over Handle and Nadolny because in creating his account to use Express Lien's website, Nadolny agreed to the website's Terms of Use, which included the forum selection clause. This clause expressly permits suit to be filed in the Eastern District of Louisiana.[20]    Under federal law, forum-selection clauses are "presumed enforceable, and the party resisting them bears a heavy burden of proof." *Ginter ex rel. Ballard v. Belcher, Prendergast & Laporte*, 536 F.3d 439, 441 (5th Cir. 2008) (citations omitted).    "The presumption of enforceability may be overcome, however, by a clear showing that the clause is 'unreasonable under the circumstances.'"    *Haynsworth v. The*

---

[20]    R. Doc. 22 at 2.

*Corporation*, 121 F.3d 956, 963 (citing *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972)).  Unreasonableness may exist where:

> (1) the incorporation of the forum selection clause into the agreement was the product of fraud or overreaching; (2) the party seeking to escape enforcement 'will for all practical purposes be deprived of his day in court' because of the grave inconvenience or unfairness of the selected forum; (3) fundamental unfairness of the chosen law will deprive the plaintiff of a remedy; or (4) enforcement of the forum selection clause would contravene a strong public policy of the forum state.

*Id.* (citing *Carnival Cruise Lines*, 499 U.S. 585, 595 (1991)).

Defendants do not argue that Express Lien's forum selection clause was unreasonable under the circumstances—and therefore unenforceable—for the reasons laid out by the Fifth Circuit.  Rather, defendants argue that (1) Nadolny lacked the authority—either actual or apparent—to bind Handle to the Terms of Use, and (2) the Terms of Use were voidable under the California & Business Professions Code, and thus do not bind defendants.

1.    *Authority to Enter the Contract*

The Court first addresses Handle's argument that Nadolny lacked the authority to bind Handle to the Terms of Use.  The Court notes at the outset that this argument deals only with whether *Handle* is bound by the Terms of Use and its forum selection clause.  This argument does not address—and in fact assumes—that Nadolny himself is bound.

Authority may be established through either actual authority or through apparent authority. *See Boulos v. Morrison*, 503 So. 2d 1, 3 (La. 1987). Actual authority may be either express or implied. *Id.* "Express actual authority is created by the oral or written agreement between the principal and the agent." *Hous. Expl. Co. v. Halliburton Energy Servs., Inc.*, 359 F.3d 777, 780 (5th Cir. 2004) (citing *AAA Tire & Expert, Inc v. Big Chief Truck Lines, Inc.*, 385 So. 2d 426, 429 (La. App. 1 Cir. 1980)). Implied authority exists when "the agent is deemed to have permission from the prinicpal to undertake certain acts which are reasonably related to the agent's position and which are reasonable and necessary concomitants of the agent's express authorization." *Id.* "In an action based on the existence of an agency relationship, such relationship must be clearly established. An agency relationship cannot be presumed." *Martin Fuel Distributors, Inc. v. Trans Gulf Fuel*, 496 So. 2d 473, 476 (La. App. 1 Cir. 1986).

Express authority can be established in either one of two ways: through a written agreement or through an oral agreement. The only written agreement of which there is evidence is Handle's offer of employment letter to Nadolny, which offers him the position of "Operations Engineer."[21] The

---

[21] R. Doc. 19-3 at 2 ("Your job title will be Operations Engineer, reporting to Patrick Hogan, CEO).

offer letter lists six duties, including "[p]lanning and implementing course of action to recover outstanding invoices for customers" and "[d]esign and implementation of the automated debt collection process."[22]  The only oral agreement of which there is evidence is a directive from Patrick Hogan, Handle's CEO.  In an affidavit, Hogan attested that he hired Nadolny "for the initial purpose of conducting research of all publicly-available resources that pertained to mechanics' lien laws in the United States, with a primary emphasis on such laws in California, Michigan, Florida, Texas, and Arizona."[23]

Neither Nadolny's offer letter nor his instructions from Hogan explicitly instruct Nadolny to enter into the Terms of Use required to use Handle's website or any other website.  There is no other indication of an express direction to use Express Lien's website or agree to the Terms of Use.  Therefore, the Court cannot find express authority to bind Handle to the Terms of Use.

Nadolny did, however, have implied authority to enter the Terms of Use on Handle's behalf, and therefore bind Handle to the Terms of Use and forum selection clause.  Implied authority is found when an action is a

---

[22]     *Id.*
[23]     R. Doc. 19-2 at 2 ¶ 11.

"reasonable and necessary concomitant[] of the agent's express authorization." *Hous. Expl. Co.* at 780. As discussed above, Nadolny did have express authority to research mechanic's lien laws online. A "reasonable and necessary concomitant" of doing so is to visit websites that have such information—such as Express Lien's—and to agree to their terms of use to access such information. It is generally known that today, use of virtually any website requires the acceptance of such a website's terms. Therefore, to access the information he was ordered by the CEO to seek out, Nadolny would almost certainly have to agree to the terms of use of the websites that contained such information. Nadolny thus had implied authority to agree to Express Lien's Terms of Use in the course of his duties.

Moreover, Nadolny's duties, as laid out in his written offer of employment, included "[p]lanning and implementing [a] course of action to recover outstanding invoices for customers" and "[d]esign[ing] and implement[ing] of the automated debt collection process."[24] Neither Hogan nor Nadolny suggests that there were relevant limits on these broad grants of authority. And although not explicit, it is not outside that broad grant of express authority for an operations engineer to visit the website of a competitor to observe how it has structured its systems for invoicing

---

[24]     *Id.* at 2.

customers and collecting debt, and necessarily to agree to the terms of use of the website in the process of doing so. Nadolny therefore had implied authority to agree to Express Lien's Terms of Use based on his enumerated duties in the offer letter.

Defendants resist this conclusion. They argue that Nadolny "was never authorized to execute any contract without the permission of Handle CEO Patrick Hogan" and that "the six enumerated duties in Nadolny's offer letter do not include executing contracts . . . nor to consenting to or waiving any legal matters that pertain to the company, such as venue and jurisdiction."[25] It is true that, as a general matter, Nadolny did not have carte blanche authority to enter contracts on Handle's behalf.

But here, Nadolny agreed to the terms of use of a website, a relatively run-of-the-mill contract that was required to execute his duties. Moreover, he did so in the course of the duties he was assigned by the CEO. Defendants' arguments suggesting that Nadolny had no authority because he did not have wide contracting authority for Handle are therefore unavailing.

Second, Defendants point to Nadolny's salary and position in his offer of employment to suggest that he could not bind his employer to the contract. Nadolny's offer letter stated that his salary was to be $40,000 per year and

---

[25]    R. Doc. 19-1 at 10.

that his title was to be Operations Engineer.[26]  Defendants contend that his "duties as Operations Engineer and his attendant salary . . . establish that Nadolny lacked the implied authority" to agree to the Terms of Use.[27]  But the offer letter also offers Nadolny generous stock options,[28] and plaintiff provides evidence from Handle's LinkedIn page that Nadolny's role is Vice President of Operations.[29]  But even were Nadolny solely an Operations Engineer with a salary of $40,000, this would not disturb the Court's finding that Nadolny had implied authority to agree to Express Lien's Terms of Use in the course of performing the actions which he had express authority to do.

Nor is *Global Towing, L.L.C. v. Marine Technical Services, Inc.*, 2000 WL 235247 (E.D. La. Feb. 29, 2000), the case relied upon by defendants, to the contrary.  There, the court found that a geophysicist did not have the authority to enter a contract guaranteeing payment to a subcontractor working on a site hazard survey.  But the contract at issue there was a negotiated contract specifically regarding the liability of the employer and was demanded by the subcontractor, not a run-of-the-mill terms of use agreement for a website account.  The type of contract at issue here is

---

[26]    R. Doc. 19-3 at 2.
[27]    R. Doc. 19-1 at 11.
[28]    R. Doc. 19-3 at 2-3.
[29]    R. Doc. 22-3 at 2.

different in kind. Moreover, in *Global Towing* the court found no implied authority because nothing in the purported agent's role as a geophysicist involved entering contracts with subcontractors, and that was the explicit role of the project manager. Here, unlike in *Global Towing*, the instructions that Nadolny was given by Hogan, as well as his duties, support a finding of implied authority.

Because Nadolny entered the Terms of Use pursuant to his implicit grant of authority from his employer, he bound Handle to the contract with Express Lien.

### 2. *California Business Code*

Defendants also argue that Express Lien's Terms of Use are void under California Law. California's Business and Professions Code contains provisions covering legal document assistants. That law states that "[e]very legal document assistant . . . who enters into a contract or agreement with a client to provide services shall, prior to providing any services, provide the client with a written contract. . . ." Cal. Bus. & Prof. Code § 6410(a). The statute also states that "[a] written contract entered into on or after January 1, 2016, shall contain a statement that . . . the venue for an action arising out of a dispute between a legal document assistant . . . and their client shall be in the county in which the client has their primary residence." *Id.* § 6410(d).

Finally, the statute states that the "[f]ailure of a legal document assistant . . . to comply with subdivisions (a), (b), (c), and (d) shall make the contract or agreement voidable at the option of the client." *Id.* § 6140(e).

Express Lien argues that the California statute does not apply for three reasons. First, Express Lien argues that it is not a "legal document assistant" within the meaning of the statute. Second, it argues that neither Handle nor Nadolny constituted a "client." And third, it argues that the statute is vague and overbroad.

Express Lien's argument that it is not a legal document assistant is unavailing. The California law defines a legal document assistant as

> A corporation . . . or other entity that employs or contracts with any person . . . who, as part of their responsibilities, provides, or assists in providing . . . any self-help service to a member of the public who is representing themselves in a legal matter, or who holds themselves out as someone who has that authority.

Cal. Bus. & Prof. Code § 6400(c)(2). Plaintiff's complaint makes clear that Express Lien falls within this description. It states that Express Lien "is a construction payment and document management software platform for parties in construction" that sells "'self-help' construction notices and lien forms, provides assistance in having those forms delivered or filed, and provides informational resources, tools and insights to parties in the

construction industry."[30]  This description of the company clearly falls within the definition of a legal document assistant laid out in the California statute. Moreover, plaintiff's website previously advertised that it was licensed as a legal document assistant in California.[31]  The Court therefore finds that Express Lien is a legal document assistant for the purposes of the California law.

Plaintiff is correct, however, that neither defendant was a "client" within the meaning of the statute.  The California statute makes clear that to apply to a given transaction, it must be between a legal document services provider and a client.  *See* Cal. Bus. & Prof. Code § 6410(a) (stating that a legal document assistant "who enters into a contract or agreement *with a client*" must "provide *the client* with a written contract" (emphases added)); *see also id.* § 6410(e) (provision of the statute stating that contracts shall contain a statement that the venue for a dispute "between a legal document assistant . . . and *their client* shall be in the county in which *the client* has their primary residence" (emphases added)).  The statute, however, does not define the meaning of "client."  Black's Law Dictionary defines "client" as a

---

30    R. Doc. 1 at 2-3 ¶ 9.
31    R. Doc. 29-2 at 2.

"person or entity that employs a professional for advice or help in that professional's line of work." *Client*, *Black's Law Dictionary* (11th ed. 2019).

Had Nadolny entered the Terms of Use only on the basis of finding general knowledge about lien statutes—a service offered by Express Lien and considered a legal document service by the statute—then he may have acted as a client. But Nadolny's actions after agreeing to the Terms of Use make clear that he was not acting legitimately to take advantage of the services offered by Express Lien. Rather, the complaint alleges that after agreeing to Express Lien's Terms of Use, Nadolny did not seek to take advantage of the legal document services offered by Express Lien, but rather to reverse engineer the website and infringe on Express Lien's copyrights.

The conclusion that Nadolny was not a "client" is bolstered by the fact that he allegedly used false names and companies to disguise defendants' identity when using Express Lien's site. Plaintiffs allege that Nadolny used false names such as "JBN Supplies" and used the names of companies with which he was not associated, such as "Abbot Construction" when opening the accounts.[32] The use of misleading names to hide his identity and that of Handle underscores that defendant did not seek to take advantage of the services offered by Express Lien's business as a *bona fide* client.

---

[32]     R. Doc. 1 at 11 ¶ 42.

Because the California statute does not apply, the Court does not reach plaintiff's arguments that the statute runs counter to the First, Fifth, and Fourteenth Amendments to the United States Constitution, and is too vague to be enforceable. And because the Court finds personal jurisdiction based on defendants' consent to litigation in this district, the Court does not reach whether personal jurisdiction also exists based on defendants' contacts with Louisiana.

## III.   FAILURE TO STATE A CLAIM

### A.   Legal Standard

When considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court must accept all well-pleaded facts as true and view the facts in the light most favorable to the plaintiff. *See Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). The Court must resolve doubts as to the sufficiency of the claim in the plaintiff's favor. *Vulcan Materials Co. v. City of Tehuacana*, 238 F.3d 382, 387 (5th Cir. 2001). But to survive a Rule 12(b)(6) motion, a party must plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The claim must be dismissed if there are insufficient factual

allegations to raise the right to relief above the speculative level, *Twombly*, 550 U.S. at 555, or if it is apparent from the face of the complaint that there is an insuperable bar to relief, *Jones v. Bock*, 549 U.S. 199, 215 (2007). The Court is not bound to accept as true legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 679.

On a Rule 12(b)(6) motion, the Court must limit its review to the contents of the pleadings, including attachments thereto. *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014). The Court may also consider documents attached to a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claims. *Id.*

## B. Discussion

Express Lien levies five claims against defendants: (1) breach of contract; (2) violation of the Louisiana Unfair Trade Practices and Consumer Protection Law; (3) fraud; (4) copyright infringement; and (5) trade dress infringement.[33] Defendants argue that plaintiff has failed to adequately plead any of these five claims. The Court addresses each claim in turn.

---

[33] *See* R. Doc. 1 at 8-27.

1. *Breach of Contract*

Under Louisiana law, the "essential elements of a breach of contract claim are (1) the obligor's undertaking an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the obligee." *Denham Homes, L.L.C. v. Teche Fed. Bank*, 182 So. 3d 108, 119 (La. App. 3 Cir. 2015). Defendants argue that plaintiff has only plausibly pleaded that defendants breached one term of the contract—the prohibition on impersonating any person or entity—and that plaintiff cannot prove damages from the breach of this provision.[34]

But plaintiff makes a series of allegations about the duties the contract placed on the obligor. For example, plaintiff alleges that

> The Terms of Use specifically set forth, in the section entitled 'Use of Company's Services' a prohibition on 'Reverse Engineering' and by agreeing to the Terms of Use, Defendant and other users specifically agree to both set stipulated and liquidated damages for prohibited 'reverse engineering' as well as injunctive relief.[35]

---

[34] *See* R. Doc. 20-1 at 6-7; *see also* R. Doc. 1 at 9 ¶ 38.
[35] R. Doc. 1 at 10 ¶ 37.

There are similar allegations with respect to the contract's prohibition on copyright infringement,[36] and copying forms and documents.[37]  Defendant's arguments seem to be that because plaintiff does not quote directly from the contract, these allegations are too "vague or general" to adequately state a claim.[38]  But these allegations point to specific parts of the contract and explain what is prohibited, which is enough to "nudge[] his claim across the line from conceivable to plausible."  *Twombly*, 550 U.S. at 547.

Moreover, plaintiff attaches excerpts from the Terms of Use to his opposition to defendants' motion to dismiss.  These excerpts clearly establish the duties the contract places on the party entering into it.  For example, it states that

> [y]ou hereby explicitly agree you will not reverse engineer, decompile, disassemble or otherwise attempt to derive the source code, techniques, processes, algorithms, know-how or other information from the Company's services, technology, products, code etc. (collectively, "Reverse Engineering") or permit or induce the foregoing.[39]

---

[36]    *Id.* at 9 ¶ 35.

[37]    *Id.* at 9 ¶ 36.

[38]    *See* R. Doc. 20-1 at 6-7.

[39]    R. Doc. 23-2 at 4.  *See also Id.* at 2 (Terms of Use excerpt forbidding copyright infringement or unauthorized use of documents).

Defendants argue that the Court may not consider these excerpts as they were not attached to the complaint, but the Court "may also consider documents attached to either a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and central to a plaintiff's claims." *Brand Coupon Network*, 748 F.3d at 631. Here, the Terms of Use are referred to in the complaint,[40] and central to plaintiff's claims. The Court may therefore consider these excerpts, and they provide ample evidence to support the plausibility of plaintiff's claim that the Terms of Use placed certain duties on defendants.

Plaintiff also adequately pleads the remaining elements of breach of contract. Express Lien alleges that defendants violated the Terms of Use by impersonating another person or entity,[41] copying Express Lien's content,[42] and reverse engineering Express Lien's website.[43] Plaintiff also adequately pleads that it suffered damages from these breaches. The Terms of Use specifically include a reference to stipulated or liquidated damages,[44] and plaintiff alleges damages arising from Louisiana Civil Code Article 1995,

---

[40]    *See, e.g.*, R. Doc. 1 at 8-9 ¶¶ 35-38.
[41]    *See* R. Doc. 1 at 10 ¶ 40.
[42]    *Id.* at 12 ¶¶ 45-46.
[43]    *Id.* at 12-13, ¶¶ 48-49.
[44]    *See* R. Doc. 1 at 8-9 ¶¶ 35-37 (referencing the stipulated and liquidated damages clauses); *see also* R. Doc. 23-2 at 2, 4 (Terms of Use extracts with stipulated and liquidated damages clauses).

which states that "[d]amages are measured by the loss sustained by the obligee and the profit of which he has been deprived." La. Civ. Code art. 1995. Because plaintiff has adequately pleaded each element of breach of contract, defendants' motion to dismiss plaintiff's breach of contract claim therefore fails.

2. *LUPTA*

Defendants next move to dismiss plaintiff's claim under the Louisiana Unfair Trade Practices and Consumer Protection Law. Louisiana law promulgates a two-prong test to sustain a cause of action under LUPTA: "(1) the person must suffer an ascertainable loss; and (2) the loss must result from another's use of unfair methods of competition and unfair or deceptive acts or practices." *NOLA 180 v. Treasure Chest Casino, LLC*, 91 So. 3d 446, 450 (La. App. 5 Cir. 2012); *see also* La. R.S. 51:1409(A) (allowing for private actions under LUPTA by "[a]ny person who suffers any ascertainable loss of money or movable property."). Defendants do not contest the second element in their motion to dismiss, but rather argue that plaintiff fails to properly allege an ascertainable loss.[45]

The only allegation plaintiff makes that could reasonably be viewed as an ascertainable loss is that

---

[45] R. Doc. 20-1 at 7.

> [d]efendant leverages [its] misrepresentations and illicit actions [discussed in the preceding paragraphs of the complaint] to drive sales, and specifically to drive sales at the expense of competitors, and to solicit investor funding and support, and specifically to solicit investor funding and support at the expense of competitors, which include the Plaintiff.[46]

In essence, plaintiff alleges that defendants' violations of LUPTA drive sales to Handle at the expense of Express Lien and allows Handle to solicit investor funding at the expense of Express Lien. The question then is whether this allegation passes muster as alleging an ascertainable loss under Louisiana law.

Although general and conclusory allegations of an injury are not enough to establish an allegation of an ascertainable loss, the law does not require a plaintiff to plead an exact amount. Indeed, Louisiana courts have rejected the contention that LUTPA requires "a precise measurement of the damage" to allege an ascertainable loss. *See, e.g., Wilson v. T&T Auto Repair & Towing, LLC*, 180 So. 3d 437, 442 (La. App. 2 Cir. 2015). Indeed, courts have found an ascertainable loss may be based "on past business and projected future sales." *Canal Marine Supply, Inc. v. Outboard Marine Corp. of Waukegan, Ill.*, 522 So. 2d 1201, 1202 (La. App 4 Cir. 1998). Courts have also found that an ascertainable loss was properly pleaded where

---

[46]     R. Doc. 1 at 20 ¶ 77.

plaintiffs only generally alleged loss of income, relevant market share, business reputation, goodwill, and attorneys' fees and costs, with the "specific amounts to be determined during discovery/trial." *Green v. Garcia-Victor*, 248 So. 3d 449, 456 (La. App. 4 Cir. 2018). The allegations in *Green* are analogous to the ones Express Lien makes in its complaint. Express Lien pleaded an ascertainable loss by alleging a loss of sales and investor funding to Handle due to Handle's actions, which is not dissimilar from the losses that were adequately plead in *Canal Marine Supply* and *Green*. This is sufficient to plead an ascertainable loss, even though Express Lien has not pleaded a specific dollar amount.

The case cited by defendants, *Checkpoint Fluidic Systems International, Ltd. v. Guccione*, No. 10-4505, 2011 WL 3268386 (E.D. La. July 28, 2011), is not to the contrary. There, the party alleging a LUPTA claim asserted only that they had been injured, without explaining how the alleged violations of LUPTA "resulted in an actual loss of business or any other form of identifiable damage to the business." *Id.*, at *10. Here, plaintiff sufficiently alleges that defendant's actions caused damage to its business by driving sales and investor funding from Express Lien to Handle. This is much more detailed than the general statement that an injury occurred that was relied upon by the party asserting a LUPTA claim in *Guccione*.

Because plaintiff adequately pleads an ascertainable loss, defendants' motion to dismiss plaintiff's LUPTA claim is denied.

### 3. *Fraud*

Defendant next moves to dismiss plaintiff's fraud claim. "To state a cause of action for fraud, the following three elements must be alleged: (1) a misrepresentation of material fact, (2) made with the intent to deceive, (3) causing justifiable reliance with resultant injury." *Chapital v. Harry Kelleher & Co., Inc.*, 144 So. 3d 75, 86 (La. App. 4 Cir. 2014). And Louisiana law requires that in "pleading fraud or mistake, the circumstances constituting fraud or mistake shall be alleged with particularity." La. Code Civ. Proc. art. 856. Here, although plaintiff alleges a misrepresentation of material fact—Nadolny's misleading and falsified account information[47]— and alleges these were made with the intent to deceive,[48] plaintiff fails to specifically and properly allege that he justifiably relied upon Nadolny's misrepresentations. Because this is a necessary element of a fraud claim under Louisiana law, plaintiff's fraud claim must be dismissed.

Plaintiff resists this conclusion by arguing that its allegation that defendants illegitimately gained access to and stole Express Lien's content

---

[47]    *See* R. Doc. 1 at 14-18 ¶¶ 55-68.
[48]    *See id.* at 18 ¶¶ 69-70.

"makes clear that if Defendant had . . . placed orders using Handle's (or a competitor's) correct information, Plaintiff would not have allowed access or process[ed] order documents."[49]  Essentially, plaintiff asks the Court to find an implied allegation of reliance because, in retrospect, plaintiff would have prevented Handle's actions in absence of the misleading information.  But this is not the law.  Because justifiable reliance is an element of fraud, it must be "alleged with particularity."  La. Code Civ. Proc. art. 856; *see also Sys. Eng'g & Sec. Inc. v. Sci. & Eng'g Ass'ns, Inc.*, 962 So. 2d 1089, 1091 (La. App. 4 Cir. 2007) ("To succeed in a claim for intentional/fraudulent misrepresentations, the petition must contain allegations of . . . causing justifiable reliance with resulting injury.")  Indeed, for the first week after Nadolny opened an account, the account accurately reflected his email address as "jeff@handle.com."  This is some indication that, at least when Nadolny first opened his account, plaintiff was not relying on his misrepresentations.

Here, although plaintiff alleges a misrepresentation made with the intent to deceive, it does not affirmatively state that it relied upon this representation in granting Nadolny access to the documents or explain what it would have done differently had Nadolny consistently used truthful

---

[49]     R. Doc. 23 at 11.

information. Such allegations of a necessary element of a claim cannot be made by implication. The Court therefore dismisses Express Lien's claim for fraud. This dismissal is without prejudice, and plaintiff may amend its complaint to include such a allegation.

### 4. *Copyright*

A claim for copyright infringement requires that the plaintiff show "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Vallery v. Am. Girl, L.L.C.*, 697 F. App'x 821, 823 (5th Cir. 2017) (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991)). Notably, copyright claims are not subject to a heightened pleading standard. *See, e.g., AK FortySeven Records Lmt. Co. v. Bahamas Ministry of Tourism*, No. 4:17-3750, 2018 WL 1877080, at *2 (S.D. Tex. Apr. 19, 2018) (collecting cases).

### i. *Ownership*

In order to show ownership of a valid copyright, "plaintiff must prove that the material is original, that it can be copyrighted, and that he has complied with the statutory formalities." *Lakedreams v. Taylor*, 932 F.2d 1103, 1108 (5th Cir. 1991). Plaintiff has adequately pleaded these elements. The complaint states: "For all of the works at issue in this matter, Plaintiff is

the owner and creator of the copyright-protected works."[50]  Plaintiff attaches

two exhibits demonstrating "content-product plagiarism/reverse

engineering examples" and "word-for-word" violations.[51]  It also alleges that

plaintiff is the registered copyright holder of eight U.S. copyrights, and it

enumerates those copyrights by copyright number.[52]  This is sufficient to

plead ownership.

Defendants, however, argue this is not so.  They argue that they lack

adequate notice of what parts of the copyrights they have violated, and assert

that plaintiff's failure to attach copies of the copyrights to the complaint is a

"basic pleading deficiency."[53]  This is incorrect as a matter of law.

Registrations need not be attached to a complaint.  *See, e.g., Arista Records*

*LLC v. Greubel*, 453 F. Supp. 2d 961, 966 (N.D. Tex 2006) (holding that

failure to attach the copyright registration is not grounds for dismissal where

plaintiff pleads that they have registered copyrights properly with the

copyright office); *Bob Daemmrich Photography, Inc. v. McGraw-Hill*

*Global Educ. Hold., LLC,* No. 15-1098, 2017 WL 2544046, at *4 (W.D. Tex.

June 12, 2017) (same).  Moreover, discovery can be used to narrow the issues

---

[50]    R. Doc. 1 at 23 ¶ 85.
[51]    *See id.* at 23 ¶ 84; *see also id* at Exhibit B, Exhibit F.
[52]    *See id.* at 22 ¶ 83.
[53]    R. Doc. 20-1 at 12.

and clarify the portions of the copyrights defendants allegedly infringed. *Arista Records* at 965-66 (noting that a partial list of copyrighted works with evidence of allegedly offending works was sufficient to put defendants on notice of the basis for a copyright infringement claim and collecting cases with similar holdings).

Defendants also argue that plaintiff has not adequately pleaded ownership because its copyrights are not original. They first assert that certain publications listed in plaintiff's Exhibit B (content-product plagiarism/reverse engineering examples) appear on other third-party websites. Defendants seem to suggest that plaintiffs failure to explain this in its complaint represents a failure to properly plead ownership. But defendants' argument directs the Court to three specific third-party websites. Although defendants attach these as exhibits to their motion, these specific third-party websites are not mentioned in or central to the allegations of the complaint. These are therefore not appropriate evidence to consider on a Rule 12(b)(6) claim, and are thus excluded at this time. *See Isquith for & on Behalf of Isquith v. Middle S. Utilities, Inc.*, 847 F.2d 186, 194 n.3 (5th Cir. 1988) (noting that "Rule 12(b) gives a district court 'complete discretion to determine whether or not to accept any material beyond the pleadings that is offered in conjunction with a 12(b)(6) motion.'" (citing *Wright & Miller*,

Federal Practice and Procedure § 1366 (1969)). Having excluded the exhibits, defendants' argument fails. Such an argument is better suited for summary judgment, and may be reurged by defendants at a later stage of the litigation.

Defendants further argue that plaintiff cannot establish ownership because copyrights for certain of the publications listed by plaintiff in Exhibit B have registration dates ranging from 2011 to 2017, but the web addresses provided in Exhibit B show dates showing that they were published or updated after 2017. Defendants note that the complaint states that "[c]ontent on the plaintiff's website constantly evolves. . . ."[54] From this, defendants make the logical leap that "*if* any of these updates were sufficient to create 'derivative works' of the original, registered works, then no claim could be brought for infringement unless and until these derivative works are separately registered.'"[55]

This argument, too, is not appropriate at the motion to dismiss stage. Defendants' argument assumes, prior to any discovery, that the works are necessarily derivative. But viewing the complaint in the light most favorable to the plaintiff, as the Court must, *see Baker*, 75 F.3d at 196, such works are

---

[54]     R. Doc. 1 at 5 ¶ 16.
[55]     R. Doc. 20-1 at 13 (emphasis added).

not derivative. As with defendants' arguments regarding third-party websites, this argument is more properly suited for summary judgment, and may be reurged by defendants at a later stage in the litigation.

## ii. Actionable Copying

Defendants also aver that plaintiff inadequately pleaded actionable copying. There are two components to actionable copying. "First is the factual question whether the alleged infringer actually used the copyrighted material to create his own work. Copying as a factual matter typically may be inferred from proof of access to the copyrighted work and 'probative similarity.'" *Eng'g Dynamics, Inc v. Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir. 1994). "The second and more difficult question is whether the copying is legally actionable. This requires a court to determine whether there is substantial similarity between the two works." *Id.* at 1341.

In its complaint, plaintiff adequately pleads that defendant had access to the copyrighted work.[56] It also adequately pleads substantial similarity by attaching two exhibits to its complaint, one containing conduct-product plagiarism and reverse engineering examples, and the other containing "word-for-word" violations.[57]

---

[56]    *See, e.g.*, R. Doc. 1 at 6-7 ¶ 23 (noting the number of times defendants visited plaintiff's website).

[57]    *See* R. Doc. 1-3, R. Doc. 1-7.

Defendants do not argue that plaintiff failed to plead access. Rather, they allege that plaintiff cannot prove substantial similarity. Defendants focus on Exhibit B to the complaint, and argue that it would not satisfy the ordinary observer test in large part because it employs a "scattershot approach."

The Court finds that Exhibit B provides sufficient facts to raise plaintiff's right to relief above a speculative level on the issue of substantial similarity. The exhibit presents over fifty pages of side-by-side comparisons reflecting similarities of each site's discussion of liens. For example, five pages of Exhibit B compare the sites' explanations of how liens work, and include nineteen examples of similar phrasing and nearly identical substance across the two sites.[58] By way of illustration, the first comparison shows each site describing a mechanics lien the same way—both emphasizing the 200-year history of the lien, both noting it "empowers" industry stakeholders to get paid—in just a few short sentences.[59] Moreover, plaintiff's Exhibit F shows two examples of word-for-word copying, with one example showing that certain sentences appear identically on both sites.[60]

---

[58]    R. Doc. 1-3 at 3-7.
[59]    *See id.* at 3.
[60]    R. Doc. 1-7 at 3 (demonstrating that the sentences "A notice of intent to lien is a lot like a demand letter.  It is a document sent to certain parties

Moreover, although defendants cite to cases that demonstrate that that substantial similarity *may* be considered at the motion to dismiss stage, *see Randolph v. Dimension Films*, 634 F. Supp. 779, 787 (S.D. Tex. 2009), the Fifth Circuit has held that the question of substantial similarity "should typically be left to the factfinder," but may be considered on summary judgment only where no reasonable juror could find substantial similarity. *Nola Spice Designs L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 550 (5th Cir. 2015) (citing *Peel & Co. v. Rug Mkt.*, 238 F.3d 391, 395 (5th Cir. 2001)). As such, defendants' arguments regarding substantial similarity are more properly considered at the summary judgment stage.

5.   *Trade Dress*

Defendants move to dismiss plaintiff's trade dress infringement claim under the Lanham Act. "'Trade dress' refers to the total image and overall appearance of a product and 'may include features such as the size, shape, color, color combinations, textures, graphics, and even sales techniques that characterize a particular product.'" *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 536 (5th Cir. 1998) (citing *Sunbeam Prods. Inc. v. West Bend Co.*, 123 F.3d 246, 251 n.3 (5th Cir. 1993)). The purpose of trade dress protection

_____

on a construction project warning that if payment isn't made, the claimant intends to file a mechanics lien." appear on both sites).

is to "secure the owner of the [trade dress] the goodwill of his business and to protect the ability of consumers to distinguish among competing producers." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774 (1992) (citing *Park N' Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 198 (1985)).

In the Fifth Circuit, there is a two-step analysis to determine whether there has been an infringement of trade dress. "First, the court must determine whether the trade dress is protected under the Act. This first inquiry encompasses three issues: (1) distinctiveness, (2) 'secondary meaning,' and (3) 'functionality.'" *Allied Marketing Grp. v. CDL Marketing, Inc.*, 878 F.2d 806, 813 (5th Cir. 1989) (citations omitted). Specifically, trade dress must be *either* distinctive or have acquired a secondary meaning, and must also be non-functional. *Id.* "If a court determines that the trade dress is protected . . . the court must then determine whether trade dress has been infringed. Infringement is shown by demonstrating that the substantial similarity in trade dress is likely to confuse consumers." *Id.*

i.    *Secondary meaning*

Here, Express Lien has not pleaded that its trade dress is entitled to protection because it is distinct. Rather, plaintiff relies on the "secondary meaning" prong of the test. To establish secondary meaning, the Fifth

Circuit applies a multi-factor test. The factors considered include (1) length and manner of use of the mark or trade dress; (2) volume of sales; (3) amount and manner of advertising; (4) nature of use of the mark or trade dress in newspapers and magazines, (5) consumer-survey evidence; (6) direct consumer testimony, and (7) the defendants' intent in coping the trade dress. *Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 476 (5th Cir. 2008).

Here, the complaint states:

> Plaintiff's website designs and language choices are widely recognized by consumers and has [sic] become a valuable indicator of the source and origin of the information provided, which in turn, drives plaintiff's sales, and positions in the field.[61]

This assertion is inadequate to plead secondary meaning. Plaintiff essentially pleads the legal elements of the claim, without any factual basis to support that claim. At most, the complaint states that its trade dress "drives Plaintiff's sales, and positions Plaintiff as a leader in this field."[62] But this conclusory allegation, without more, does not raise plaintiff's assertion of a secondary meaning above a speculative level. And courts routinely dismiss claims when plaintiffs allege secondary meaning in only conclusory

---

[61]    R. Doc. 1 at 25 ¶ 96.

[62]    *Id.*

terms without additional facts.  *See, e.g., FC Online Mktg. Inc. v. Burke's Martial Arts, LLC,* No. 14-3685, 2015 WL 4162757, at *9 (E.D.N.Y. July 8, 2015) (dismissing a claim for lack of secondary meaning that alleged "extensive . . . web presence," "hundreds . . . of websites," "thousands of man hours, and significant amount of money expended"); *ABJ Enters., LLC v. Backjoy Orthotics, LLC*, No. 16-758, 2016 WL 7341702, at *5 (D. Conn. Dec. 18, 2016) (dismissing a claim because "an extensive and successful history of selling and advertising, without more . . . is not sufficient to demonstrate that the claimed trade dress has secondary meaning for the purposes of a trade dress infringement claim"); *Domo, Inc. v. Grow, Inc.*, No. 17-812, 2018 WL 2172937, at *4 (D. Utah May 10, 2018) (dismissing a claim for failure to plead secondary meaning, even when the complaint included a recitation of the common business strategy and four years of marketing).  Plaintiff therefore does not adequately plead secondary meaning, and fails to state a trade a dress claim.

The sole case to which plaintiff cites is inapposite here.  In another case involving plaintiff, *Express Lien v. National Ass'n of Credit Management, Inc.*, No. 13-3323, 2013 WL 4517944 (E.D. La. 2013), plaintiff made similarly conclusory allegations, and survived a motion to dismiss.  But there, the defendants moved to dismiss on different grounds, namely that plaintiff

lacked a trademark and a comparison of the two websites showed no infringement.[63]  The defendants did not move to dismiss on the grounds that the complaint failed to allege secondary meaning or was otherwise insufficient, nor did the court consider such arguments in rendering a decision.  This case therefore offers no support to plaintiff here.

## ii.  *Functionality*

The Lanham Act states that "the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional."   15 U.S.C. § 1125(a)(3).  Courts have held that a plaintiff alleging a trade dress claim must affirmatively assert non-functionality.  *See, e.g.*, *Domo, Inc.*, at *5 ("[P]laintiffs seeking trade dress protection must allege that the protected features are non-functional."); *Bubble Genius LLC v. Smith*, 239 F. Supp. 3d 586, 594 (E.D.N.Y. 2017) (holding that to plead a claim to trade dress infringement, a plaintiff must allege that the claimed trade dress is non-functional).

Express Lien's complaint is devoid of any allegation that its trade dress is non-functional.  Indeed, Express Lien's only argument in its opposition with respect to functionality is that although individual elements of a trade

---

[63]  *See* E.D. La. Civ. Case No. 13-3323, R. Doc. 6 (moving to dismiss Express Lien's trade dress claim on grounds separate from those argued here).

dress may be functional, and therefore unprotectable, these elements can be considered as part of a whole trade dress that is protectable. It is true that the Fifth Circuit has held that "a particular arbitrary combination of functional features, the combination of which is not itself functional, properly enjoys protection." *Taco Cabana Int'l., Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1119 (5th Cir. 1991). But this does nothing to remedy plaintiff's failure to affirmatively plead non-functionality. Because Express Lien's complaint lacks any allegation that its trade dress is non-functional, it fails to adequately state a trade dress claim.

### iii. *Confusing Consumers*

Even had plaintiff adequately alleged that its trade dress was protected under the Lanham Act, it must also allege infringement of the trade dress by properly alleging consumer confusion. The Fifth Circuit has held that confusion "exists when customers viewing the mark would probably assume that the product or service it represents *is associated with the source* of a different product or service identified by a similar mark." *Fuddruckers v. Doc's B.R. Others, Inc.*, 826 F.2d 837, 845 (5th Cir. 1987) (emphasis in original). The Fifth Circuit has also named factors to determine whether there is a likelihood of confusion between two products, including (1) similarity of products; (2) identity of retail outlets and purchasers; (3)

identity of advertising media; (4) type (i.e., strength) of trademark or trade dress; (5) defendant's intent; (6) similarity of design; and (7) actual confusion. *See Sno-Wizard Mfg. v. Eisemann Products Co.*, 791 F.2d 423, 428 (5th Cir. 1986).

Plaintiff's complaint states:

> Defendants' use in commerce of Plaintiff's website content and/or website content confusing similar to Plaintiff's, and/or use of confusing similar 'look and feel' is likely to cause confusion, or to case mistake, or to deceive as to the affiliation, connection, or association of Defendant with Plaintiff, or as to the origin, sponsorship, or approval of the Defendant's service, information or commercial activities with Plaintiff in violation of 15 USC § 1125(a).[64]

As with plaintiff's allegation regarding secondary meaning, this allegation insufficient to state a claim. It includes no facts, outside of conclusory allegations, that support the proposition that customers would probably assume that plaintiff's services are associated with Handle's services based on similar trade dress. Nor does plaintiff point to any facts relevant to the factors enumerated by the Fifth Circuit to determine whether there is a likelihood of confusion between two products. Plaintiff's claim for a trade dress violation therefore fails on these grounds as well.

iv. *Synthesizing features*

---

[64]    R. Doc. 1 at 27 ¶ 100.

Defendants also move to dismiss plaintiff's trade dress claim on the grounds that it only catalogues features of Express Lien's website and does not synthesize how those features combine to create a protectable "look and feel." Although plaintiff lists examples of various aesthetic features of its website, such as the use of the "Lato" font in grey,[65] it does not attempt to combine these features into a common aesthetic or "look and feel." District courts have held that an incomplete cataloging of elements of a website, when unaccompanied by any effort to synthesize the elements into a common look and feel, is insufficient to state a trade dress claim. *See, e.g.*, *Salt Optics, Inc. v. Jand, Inc.*, No. 10-0828, 2010 WL 4961702, at *6 (C.D. Cal. Nov. 19, 2010).

Although the Fifth Circuit has not addressed this issue directly, it has held that "[w]hen alleging a trade dress claim, the plaintiff must identify the discrete elements of the trade dress that it wishes to protect." *Test Masters Educ. Servs., Inc. v. State Farm Lloyds*, 791 F.3d 561, 565 (5th Cir. 2015). It also has held that there must be an allegation of aesthetic similarity to state a "look and feel" trade dress claim for a website. *See Laney Chiropractic & Sports Therapy, P.A. v. Nationwide Mut. Ins. Co.*, 866 F.3d 254, 262 (5th Cir. 2017). Based on this guidance, the Court finds that plaintiff's trade dress

---

[65]    *See* R. Doc. 1 at 25 ¶ 98(A).

claim also fails for offering an incomplete list of examples of the "look and feel" of the trade dress it alleges is protectable, with no attempt to synthetize those elements to describe a common aesthetic.

Because plaintiff has failed to allege an adequate trade dress claim for the reasons described above, the Court dismisses Express Lien's trade dress claim. This dismissal is without prejudice, and plaintiff may file an amended complaint reasserting this claim within twenty-one days.

### C.   Leave to Amend

Although plaintiff has not adequately pleaded all its claims, that does not mean that it could not do so. And plaintiff requests leave to amend his complaint to the extent the Court is "inclined to grant the defendants' instant Rule 12(b)(6) motion."[66] Plaintiff has not previously amended its complaint. "The Court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). *See also Foman v. Davis*, 371 U.S. 178, 182 (1962) ("If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits."). When deciding whether leave to amend should be given, the Court considers multiple factors, including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure

---

[66]   R. Doc. 23 at 3.

deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of the amendment." *Foman*, 371 U.S. at 182. The Court finds none of these factors present here. The Court will therefore dismiss Express Lien's fraud and trade dress claims without prejudice and with leave to amend within twenty-one days of entry of this Order.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES defendants' motion to dismiss for lack of personal jurisdiction. It also DENIES defendants' motion to dismiss for failure to state a claim with respect to plaintiff's breach of contract, Louisiana Unfair Trade Practices and Consumer Protection Law, and copyright claims. The Court GRANTS defendants' motion to dismiss for failure to state a claim as to plaintiff's fraud and trade dress claims. Plaintiff is granted leave to file an amended complaint within twenty-one days.

New Orleans, Louisiana, this __3rd___ day of March, 2020.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE